**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**KIMBERLY M. ROBBINS,**

      **Plaintiff,**

**-vs-**                **Case No. 6:05-CV-504-ORL-KRS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**
_____

## ORDER

This cause came on for consideration without oral argument on the Complaint

filed by Kimberly M. Robbins, seeking review of the final decision of the Commissioner of

Social Security denying her claim for social security benefits.  Doc. No. 1.  The

Commissioner answered the Complaint and filed a certified copy of the record before the

Social Security Administration (SSA).  Doc. No. 7.  Pursuant to the consent of the

parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).

Doc. No. 11.

**I.  PROCEDURAL  HISTORY.**

In October 2001, Robbins applied for disability benefits under the Federal Old

Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., and

under the Supplemental Security Income for the Aged, Blind and Disabled Program

(SSI), 42 U.S.C. § 1381, *et seq*. (sometimes collectively referred to herein as the Act).

-1-

R. 61-63, 364-65.  The applications alleged that Robbins became disabled on August 9, 2001. *Id*.  Robbins's applications were denied initially and on reconsideration.

Robbins requested a hearing before an administrative law judge (ALJ).  An ALJ held a hearing on August 4, 2004. Robbins, represented by an attorney, testified at the hearing. R. 375-414.

After considering the testimony and the medical evidence presented, the ALJ determined that Robbins was insured under OASDI through November 8, 2004, the date of the decision. R. 18. The ALJ found that Robbins had not engaged in substantial gainful activity since the alleged onset date of her disability. R. 18.

The ALJ concluded that the medical evidence showed that Robbins had fibromyalgia[1], degenerative cervical and lumbar disc disease, mild degenerative joint disease of both hips, and obesity, which were severe impairments.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[2]  R. 15-16.  The ALJ concluded that Robbins did not have a severe mental impairment.  R. 15.

_____

[1]  "A syndrome characterized by chronic pain, stiffness, and tenderness of muscles, tendons, and joints without detectable inflammation.  Fibromyalgia does not cause body damage or deformity.  However, undue fatigue plagues the large majority of patients with fibromyalgia and sleep disorders are common in fibromyalgia." MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=3453 (last visited Sept. 25, 2006).

[2]  The Code of Federal Regulations "contains a Listing of Impairments . . . specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ found that Robbins had the residual functional capacity (RFC) to do the following: "lift and carry no more than a maximum of 10 pounds at a time occasionally, sit for about 6 hours per 8-hour workday, stand and walk for about 2 hours per 8-hour workday, push and pull without limitation, climb, balance, stoop, kneel, crouch and crawl with occasional limitations, and with the requirement that she avoid concentrated exposure to wetness, humidity, fumes and gases . . . ."  R. 16.

In reaching this conclusion, the ALJ gave little weight to the opinion of Dr. Pancorbo, Robbins's treating rheumatologist, finding that his RFC assessment was inconsistent with the medical evidence as a whole and Robbins's activities of daily living. R. 17.   The ALJ also found that Robbins's testimony was less than credible, again because he concluded it was inconsistent with the medical evidence as a whole and Robbins's reported activities of daily living.  R. 17.  Instead, the ALJ gave great weight to the opinion of Dr. Calero, a consulting physician, who opined that Robbins could perform sedentary work.  R. 17.

Because Robbins's past work required more than a sedentary level of exertion, the ALJ concluded that Robbins could not return to her past relevant work.  R. 17. Despite his finding that Robbins would have occasional postural limitations, the ALJ concluded that Robbins had "no nonexertional limitations." R. 18.  The ALJ concluded, apparently based on Social Security Ruling 83-11, that Robbins could "perform substantially all of the requirements of sedentary work."  *Id*.  Relying exclusively on the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ

concluded that Robbins could perform work that was available in the national economy. R. 18.  Therefore, the ALJ concluded that Robbins was not disabled.  R. 18.

Robbins requested review of the ALJ's decision. R. 373-74.  On January 28, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 6-8. The Commissioner does not contend that Robbins's complaint in this case was not timely filed.  *Cf.  Stone v. Heckler*, 778 F.2d 645, 649 n.7 (11th Cir. 1985)(sixty-day time period for filing civil complaint is not jurisdictional).

## II.    JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Robbins's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STATEMENT OF FACTS.

*A.    Robbins's Testimony and Written Statements.*

Robbins was born May 6, 1966.  R. 380.  She is 5'6" tall. R. 381.  She had always been overweight, despite trying many diets.  R. 381.

Robbins finished the tenth grade and subsequently obtained a GED.  R. 385.  She worked as a cashier and stocker in auto parts and gift shops and with a cleaning service, as well as being a school bus driver.  R. 386-89.

Robbins had pain every day that was not relieved with medication.  R. 408-09. She had generalized aches and pain throughout her body due to fibromyalgia.  R. 382, 393. She reported numbness down her legs with sharp pain in her lower back and hips. R. 394. She had occasional numbness in her right hand that interfered with her ability to do work with her hands.  R. 382.  She had a thyroid condition that was treated with medication, but the medication made her tired and fatigued.  R. 391.  She also had heartburn and acid reflux.  R. 410.  She was being treated for depression, which was substantially relieved with medication.  R. 391-92.  Nevertheless, she indicated that she had problems concentrating and would have difficulty dealing with people.  R. 392-93, 395.  For instance, she could not focus on a thirty-minute television show and had difficulty remembering things she read.  R. 395.

She could not sit for more than fifteen to twenty minutes due to numbness, tingling and, eventually, pain in her hips.  R. 390, 396.  Pain from fibromyalgia also interfered with her ability to sit, walk, lift, and sleep.  R. 393-94.  She estimated that she could walk less than a block before needing to sit down due to pain.  R. 397.  Bending caused pain in her hips, and she could not squat due to problems with her knees and hips.  R. 397.  She could lift no more than ten to fifteen pounds due to shoulder pain.  R. 397-98.

Robbins had been diagnosed with mild sleep apnea, which was treated with medication.  R. 386-87.  She did not sleep well at night, sleeping for about two hours at a time before needing to move due to numbness, tingling, and pain.  R. 398.  She was tired during the day and she had little energy.  R. 400.

On a typical day, Robbins would get up at about 8:00 a.m. and attend to her personal hygiene and make her bed.  R. 400.  She did not take a shower every day because it was difficult to stand.  R. 92, 408.  She would have to rest before getting her son up and dressed.  R. 400, 408.  Her son had muscular dystrophy and was confined to a wheelchair.  R. 384, 401.  Because Robbins could not lift her son, she did not give him regular showers or baths.  R. 402.  She would do housework at intervals, sitting down to rest periodically.  R. 404, 406.  For instance, she would bring clothes that had been washed into the living room and fold them while sitting down.  R. 407.  Then she would rest in the recliner and watch television.  R. 404.  She would also nap for up to two hours during the day.  R. 404-05.  She would attempt crafts or crocheting for fifteen to thirty minutes, but this hurt her hands.  R. 407.  Later in the day, she would cook dinner, again in intervals.  R. 406.

Robbins was able to drive, but numbness and tingling in her arms caused her concern about driving.  R. 386, 395-96.   Consequently, she drove only about once a week for no more than ten miles.  R. 396.

B.      Medical Records.[3]

An x-ray taken on July 29, 1998, revealed that Robbins had degenerative changes in her thoracic spine.  R. 202.

John F. Wilker, M.D., examined Robbins on February 25, 1999 for complaints of allergies and asthma.  In March 1999, she returned to Dr. Wilker with complaints of

---

[3]      Because Robbins does not challenge the ALJ's conclusion that she did not have severe mental impairments, I will not review the evidence of Robbins's mental condition.

persistent headaches.  R. 301.  In July 1999, Dr. Wilker treated Robbins for hypertension

(HTN), headaches, low back pain, and insomnia due to pain.  R. 299. These complaints

continued through March 2000.  She complained of excessive daytime sleepiness in

March 2000.  R. 297-98.  In April 2000, she also complained of dizziness, some blurred

vision, and heartburn.  R. 297.  Dr. Wilker noted that Robbins was morbidly obese.  R.

297.

On August 22, 2000, Adam Griggs, D.O., administered a polysomnogram test.

The study revealed that Robbins had a mild degree of sleep-related breathing

impairments.  Dr. Griggs indicated that Robbins should use caution when driving or

operating heavy machinery.  R. 135-36.

In February 2001, Robbins told Dr. Wilker that she had right wrist and hand pain.

He prescribed use of a wrist splint.  R. 292.  In May 2001, Dr. Wilker noted that

Robbins's hypertension, osteoarthritis, and depression were under good control with

medication. R. 291.

In May 2001, an MRI was taken to assess Robbins's complaints of right shoulder

pain with numbness and tingling in her right arm.  The results were unremarkable.  R.

201.

Records of treatment by Penny S. Glickman, M.D., dated August 2000 through

June 2001, reflect that Robbins had a thyroid nodule, hypertension stable with

medication, and complaints of blurred vision, fatigue, headaches, and nausea.  R. 148-

51, 173-80.  On August 29, 2000, she weighed 328 pounds, down from a high of 350

pounds one year earlier.  R. 178.

In June 2001, Robbins reported to Dr. Wilker that she was having daily spells in which she felt very weak and disoriented.  R. 290.

On August 10, 2001, Robbins had a right thyroidectormy to remove the nodule. R. 234.  In a follow-up examination with Dr. Wilker on August 30, 2001, Robbins's blood pressure was high and she had pain in her shoulder, elbow, both hips, both knees, and carpal tunnel like symptoms in her left hand.  Pain medication did not completely relieve the symptoms.  R. 288.

In October 2001, Robbins was examined at Orthopaedic Associates of Osceola for cervical complaints with radiation to both arms following her involvement in a motor vehicle accident on March 7, 2001.  Upon examination, Markus Kornberg, M.D., noted that Robbins's cervical range of motion was restricted and that she had tenderness at the base of the neck and in the trapezius region.  X-rays showed cervical and lumbar degeneration with a disc herniation.  The assessment was cervical spondylosis with persistent radicular symptoms.  R. 189, 193, 196; *see also* R. 191-92. Dr. Kornberg recommended epidural steroid injections.  R. 189.

On February 28, 2002, Robbins was examined by German Calero, M.D., at the request of the SSA.  At that time, Robbins complained of cervical pain with numbness in both arms, pain in both hips, knees and ankles, obesity with hypertension, daily headaches with dizziness, and tiredness.  She was taking a variety of medication.  R. 260.  An x-ray revealed mild osteoarthritis in both hips.  R. 264.

Dr. Calero observed that Robbins walked without an assistive device.  R. 260.  He observed that Robbins had some limitation on motion of the lumbar spine and that she

experienced pain on palpation of both hips.  She also complained of pain with movement of her left shoulder and a dull pain in her posterior cervical spine.  She had difficulty squatting.  She was able to hold a small object with either hand and had good synchronization and manipulation of both hands.  He noted that Robbins was markedly obese.  Dr. Calero's diagnosis was that Robbins suffered from obesity, hypertension, hyperthyroidism, sleep apnea disorder, osteoarthritis, and chronic depression.  R. 261. He opined that Robbins could do a lot of walking and might not be able to have a job that required a lot of physical activity.  However, he opined that he was "quite sure that she is going to be able to have a sedentary position."  R. 262.

On October 18, 2002, Mario Medero, M.D., examined Robbins at the request of the SSA.  At that time, Robbins complained of pain effecting most of the joints of her body.  She could walk about 200 feet before having to stop due to pain and climbing stairs was "'nearly impossible.'"  R. 312.  Upon examination, Dr. Medero observed that Robbins was morbidly obese.  She walked with a mildly antalgic gait.  He found no deformity, redness, heat, swelling, pain, tenderness or other signs of inflammation in her joints.  Her range of motion was decreased generally, but her motor, sensory and reflexes were normal.  Her grip strength and fine manipulation were also normal.  R. 312-15.

A treatment record dated May 2003, reflects that Robbins complained of pain in both arms, headaches, and neck pain.  Her weight was more than 300 pounds.  She was treated with Darvocet and Soma.  R. 339.

Robbins was treated by Robert Pancorbo, M.D., and Karamali A. Bandealy, M.D., who are board-certified rheumatologists, at the Central Florida Arthritis Center starting in September 2003.  R. 359.  In April 2004, Robbins complained of pain throughout her body with morning stiffness in her joints, fatigue, and poor sleep.  She continued to complain of numbness in her arms with tingling.  She walked slowly due to her size. Trigger points were mild to the touch. Dr. Bandealy's assessment was polyarthritis[4] of hands and feet, fibromyalgia syndrome, degenerative joint disease (DJD) of the hands, depression, hypothyroidism, and hypertension.  He treated her with medication.  R. 356.

On July 21, 2004, Drs. Pancorbo and Bandealy completed an RFC assessment based on their treatment of Robbins.  They opined that Robbins had fibromyalgia, cervical radiculopathy, degenerative joint disease of the hands, and polyarthritis.  They described Robbins's pain as moderately severe to severe.  They opined that Robbins could not perform even sedentary work for eight hours per day, forty hours per week.  R. 359-63

C.      Reviewing Professionals.

On April 3, 2002, a physician whose signature is illegible completed an RFC assessment after review of Robbins's medical records.  The reviewer concluded that Robbins could lift ten pounds occasionally and less than ten pounds frequently.  She could stand or walk at least two hours and sit about six hours in an eight-hour workday. She could occasionally climb, balance, stoop, kneel, crouch and crawl, but never climb

---

[4]       "Inflammation in many joints; conventionally in more than four joints." Spondylitis Association of America, http://www.spondylitis.org/patient_resources/ glossary.aspx (last visited Sept. 25, 2006).

ladders, ropes, and scaffolds.  R. 265-72.

On November 13, 2002, Gloria Hankins, M.D., also completed an RFC assessment based on review of Robbins's records.  She opined that Robbins could lift twenty pounds occasionally and ten pounds frequently.  She could stand or walk two to four hours and sit about six hours in an eight-hour workday.  She could only occasionally climb, balance, stoop, kneel, crouch, or crawl.  She should avoid concentrated exposure to wetness, humidity, fumes, odors, dusts, gases, poor ventilation and the like. R. 316-23.

IV.    **STANDARD OF REVIEW.**

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an

ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.     ANALYSIS.

Robbins asserts many interrelated issues.  She contends that the ALJ improperly disregarded the functional capacity assessment made by her treating rheumatologists, Drs. Pancorbo and Bandealy, in determining her RFC.  She asserts that the ALJ also improperly determined that she did not have significant nonexertional impairments arising from pain, due in part to his incorrect determination that her complaints of pain were not fully credible.  She submits that because the ALJ erred in determining her nonexertional impairments, use of the Grids at step five of the sequential evaluation was improper.  These are the only issues I will address.[5]

A.  *Determination of Non-Exertional Impairments and Credibility.*

In this circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard.  This standard "'requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'"  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991)).  If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  *Foote*, 67 F.3d at 1562.

---

[5]      The parties were advised that issues not specifically raised would be waived.  Doc. No. 8 at 2.

The ALJ found that Robbins suffered from fibromyalgia, degenerative cervical and lumbar disc disease, mild degenerative joint disease of both hips, and obesity, all of which are underlying medical conditions that could result in the pain and other subjective symptoms about which Robbins complained.  The ALJ found that Robbins's complaints of pain were less than credible because they were inconsistent with the medical evidence as a whole and with her activities of daily living.  Substantial evidence does not support this conclusion.

The medical evidence as a whole, as discussed above, reveals that Robbins complained of pain and other subjective symptoms consistently beginning at least by 2001.  Her complaints were credited by treating physicians, who prescribed pain medication and epidural steroid injections.  Finally, in 2004, board-certified rheumatologists determined that Robbins suffered from fibromyaglia, which, by definition, results in pain all over, fatigue, disturbed sleep and stiffness, with multiple tender spots. *See Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1250 (N.D. Ala. 2003) (citing *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996)); *see also  Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir.1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling.").

Robbins's activities of daily living do not undermine her testimony.  Notably, the ALJ does not recite in his decision the activities of daily living he found to be inconsistent with Robbins's testimony.  Robbins testified that she engaged in activities of daily living in intervals, resting as necessary between and during tasks.  She limited her driving to short distances once a week.

Because substantial evidence does not support the ALJ's assessment of

Robbins's nonexertional impairments, the ALJ's decision cannot be sustained.

       B.      *Residual Functional Capacity and Use of the Grids*.

       The ALJ relied primarily upon the opinion of Dr. Calero to determine that Robbins could perform sedentary work.  He concluded, however, that Robbins would have nonexertional postural and environmental limitations.  Even assuming that the ALJ's assessment of Robbins's RFC was correct, use of the Grids was precluded in light of the nonexertional impairments that the ALJ found to exist.

       Before the Grids were promulgated in 1979, the preferred method of determining whether there was work available that a social security claimant could perform was through the testimony of a vocational expert (VE).  *See Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir. 1981).  After the United States Supreme Court approved use of the Grids in appropriate cases, *see Heckler v. Campbell*, 461 U.S. 458 (1983), three-judge panels in the Eleventh Circuit began to address whether the Grids could be relied upon at step five of the sequential evaluation process when the claimant had nonexertional impairments that limited his work skills.

       The law that developed in this circuit requires that the ALJ initially determine whether the claimant's alleged nonexertional impairments limit the ability to work; if they do not, then exclusive reliance on the Grids at step five of the evaluation process is appropriate. *See Reeves v. Heckler*, 734 F.2d 519, 524 (11th Cir. 1984)(citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 537 (6th Cir. 1981); *see also Broz v. Schweiker*, 677 F.2d 1351, 1363 (11th Cir. 1982)(remanding for consideration whether a claimant's nonexertional impairments significantly limited his basic work skills, and then, whether the Grids could be used), *vacated, Heckler v. Broz*, 461 U.S. 952 (1983),

*adhered to on remand, Broz v. Schweiker*, 711 F.2d 957 (11th Cir.), *modified in other respects*, 721 F.2d 1292 (11th Cir. 1983).  However, if the ALJ finds that the claimant's nonexertional impairments significantly limit the claimant's basic work skills, otherwise stated as precluding the wide range of work at a given exertional level, then exclusive reliance on the Grids is not permitted.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004) (citing *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985)). Rather, the ALJ must turn to VE testimony regarding the specific jobs that the claimant can perform in light of the claimant's functional capacity.  *See id.* at 1243; *Welch v. Bowen*, 854 F.2d 436, 439-40 (11th Cir. 1988); *Gibson v. Heckler*, 762 F.2d 1516, 1521-22 (11th Cir. 1985).

The ALJ's decision that nonexertional impairments do not significantly limit basic work skills (that is, do not preclude a wide range work at a given exertional level) must be supported by substantial evidence in the record. For example, in *Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989), the ALJ found that the claimant had nonexertional impairments arising from borderline intellectual functioning and a dysthymic disorder that precluded her from performing complex tasks and working under extraordinary stress. The ALJ concluded that these nonexertional limitations only slightly diminished the claimant's capacity to perform light work and relied upon the Grids to conclude that there was work available that the claimant could perform.  The Eleventh Circuit reversed the decision, holding that use of the Grids was inappropriate.  The Court explained as follows: "Absent testimony from a vocational expert, the ALJ's conclusion that appellant's mental limitations do not significantly compromise her basic work skills or are not severe enough to preclude her from performing a wide range of light work is not supported by

substantial evidence." *Id.* at 1202.

Similarly, in *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992), the ALJ found that the claimant had a seizure disorder that resulted in a nonexertional impairment limiting his ability to work around unprotected heights or hazardous machinery.  The ALJ concluded that these nonexertional limitations did not reduce the range of light work available to the claimant.  The court reversed this decision, emphasizing that "'it is only when the claimant can clearly do unlimited types of light work, . . . that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy." *Id.* at 839 (quoting *Allen v. Sullivan,* 880 F.2d 1200, 1202 (11th Cir. 1989), and *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. Unit A March 1981)).

In the present case, it appears that the ALJ relied upon SSR 83-11 to conclude that Robbins's postural and environmental limitations did not significantly limit her ability to perform sedentary work.   However, SSR 83-11 provides no support for the ALJ's conclusion that the postural and environmental limitations he found to exist would not preclude Robbins from performing a wide range of sedentary work.  *See* SSR 83-11, 1983 WL 31252.

Furthermore, I have not found any Eleventh Circuit decision in which the court approved reliance on a Social Security Ruling, without other evidence, to support the conclusion that a claimant could perform a wide range of work despite nonexertional impairments.  Under the law discussed above, the rule in this circuit appears to be that when the ALJ finds that nonexertional functional limitations exist, VE testimony is necessary to support an ALJ's conclusion that those nonexertional impairments do not

significantly limit basic work skills.  *See, e.g.*, *Marbury*, 957 F.2d at 839.

Accordingly, remand is required to permit the Commissioner to obtain vocational expert testimony to determine whether Robbins's nonexertional limitations, as determined after proper assessment of her testimony and the medical evidence as a whole, significantly limits her ability to perform sedentary work.  If it does, then reliance on the Grids is improper.

C.      *Award of Benefits or Remand.*

Robbins requests that the Court order the Commissioner to pay her disability benefits.  A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt."  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).  Here, the record does not establish disability without any doubt.  Rather, remand is required to permit the Commissioner to reassess the affect of nonexertional limitations arising from Robbins's impairments and to determine the effect those limitations would have on her ability to perform a wide range of sedentary work relying upon the testimony of a vocational expert.

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the

Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42

U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a

judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** this 26th day of September, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE